# United States Court of Appeals
# for the Federal Circuit

—————————————————

**KYD, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

AND

**POLYETHYLENE RETAIL CARRIER BAG
COMMITTEE,
HILEX POLY CO., LLC, AND SUPERBAG
CORPORATION,**
*Defendants-Appellees.*

—————————————————

2009-1366

—————————————————

Appeal from the United States Court of International Trade in case no.07-00456, Judge Evan J. Wallach.

—————————————————

Decided: May 28, 2010

—————————————————

DAVID J. CRAVEN, Riggle & Craven, of Chicago, Illinois, argued for plaintiff-appellant.

DAVID L. SILVERBRAND, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel was SCOTT D. MCBRIDE, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

DANIEL L. SCHNEIDERMAN, King & Spalding LLP, of Washington, DC, argued for defendants-appellees Polyethylene Retail Carrier Bag Committee, et al. With him on the brief was STEPHEN A. JONES. Of counsel was JOSEPH W. DORN.

———————————

Before NEWMAN, BRYSON, and DYK, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* BRYSON.

Opinion concurring-in-part and dissenting-in part filed by *Circuit Judge* DYK.

BRYSON, *Circuit Judge.*

KYD, Inc., an importer of polyethylene retail carrier bags ("PRCBs"), challenges an antidumping duty imposed on bags made by King Pac Industrial Co., Ltd., a Thai company that manufactured the bags KYD imported. KYD appeals from a decision of the Court of International Trade, which affirmed a determination by the Department of Commerce setting the antidumping duty rate for King Pac's bags at 122.88 percent.

I

In 2004, Commerce issued an antidumping duty order on PRCBs from Thailand. Polyethylene Retail Carrier Bags From Thailand, 69 Fed. Reg. 48,204 (Aug. 9, 2004) (antidumping duty order). In that order, Commerce assigned an antidumping duty rate of 122.88 percent to Zippac Company and two other exporters who failed to cooperate with Commerce's investigation. Commerce assigned that rate based on 19 U.S.C. § 1677e, which provides that if an interested party withholds or fails to provide requested information, Commerce shall "use the facts otherwise available in reaching the applicable determination." Id. § 1677e(a)(2). In the case of an uncooperative respondent, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b). A margin based on such an adverse inference is referred to as an adverse facts available ("AFA") margin.

When Commerce initiated its investigation of PRCBs from Thailand in July 2003, it noted that the domestic industry petitioners had calculated dumping margins for Thai-manufactured PRCBs ranging from 24.84 percent to 122.88 percent. The petitioners' information as to the normal value and export prices of those PRCBs was based on information from a single large Thai producer. Polyethylene Retail Carrier Bags From The People's Republic of China, Malaysia, and Thailand, 68 Fed. Reg. 42,002, 42,004 (July 16, 2003) (initiation of antidumping duty investigations).

In its preliminary and final determinations of sales at less than fair value, Commerce stated that it corroborated the petitioners' export price and normal price calculations by comparing the prices and expenses set forth in the petition with the prices and expenses submitted by the

responding Thai companies for comparable products. In particular, Commerce explained that it examined information in the petition such as price quotations from the large Thai producer for various sizes of PRCBs commonly produced in Thailand, import statistics, and affidavits from managers of the Thai producer. Based on its investigation, Commerce found that the information in the petition was "reasonable." Commerce also stated that it had found no information indicating that the dumping margin of 122.88 percent was inappropriate. To the contrary, Commerce concluded that the record supported the use of 122.88 percent as the "best indication" of the dumping margin for the uncooperative exporters, including Zippac, as it had "probative value" with respect to those firms and reflected "the appropriate adverse inference." Polyethylene Retail Carrier Bags From Thailand, 69 Fed. Reg. 3552, 3554 (Jan. 26, 2004) (preliminary determination of sales at less than fair value); Polyethylene Retail Carrier Bags From Thailand, 69 Fed. Reg. 34,122, 34,123-24 (June 18, 2004) (final determination of sales at less than fair value).

In 2006, Commerce conducted the first administrative review of the antidumping duty order, for the period January 26, 2004, through July 31, 2005. In response to Commerce's questionnaire, King Pac responded on behalf of four entities, including Zippac, claiming that all four companies were affiliated due to common ownership and that they should be reviewed as a single entity. Commerce made several requests for information from King Pac, but it found King Pac's information to be incomplete, internally inconsistent, misleading, and inaccurate. Commerce concluded that although King Pac maintained detailed records containing all the information necessary to provide a complete and accurate questionnaire response, King Pac "did not provide complete or correct information" in response to Commerce's questionnaires.

Decision to Apply Adverse Facts Available and the Appropriate Rate for the Preliminary Results of Review, at 5 (Aug. 31, 2006). Because Commerce determined that King Pac had significantly impeded the administrative review by not providing accurate and necessary information contained in its records, and had not acted to the best of its ability in producing the requested information, Commerce found it appropriate to calculate a dumping margin for King Pac based on facts otherwise available and to use an adverse inference in selecting from among the facts otherwise available. *Id.* at 5-6.

In the final results of the first administrative review, Commerce assigned an AFA rate of 122.88 percent to King Pac. Polyethylene Retail Carrier Bags From Thailand, 72 Fed. Reg. 1982 (Jan. 17, 2007) (final results of administrative review). In response to King Pac's objection that the 122.88 percent AFA rate was punitive, Commerce explained that in addition to the analysis based on the materials submitted with the petition, it had calculated "transaction-specific margins for cooperative companies which are higher than the petition rate," from which Commerce concluded that "the petition rate does not lie outside of the realm of actual selling practices and therefore is not punitive but is meant to encourage King Pac's cooperation." Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Polyethylene Retail Carrier Bags From Thailand for the Period of Review January 26, 2004, through July 31, 2005, at 30 (Jan. 9, 2007).

On King Pac's request for review, the Court of International Trade sustained Commerce's decision. *Universal Polybag Co. v. United States*, 577 F. Supp. 2d 1284 (Ct. Int'l Trade 2008). The court held that Commerce had validly corroborated the AFA rate assigned to King Pac by looking to (1) the rate assigned to one of the companies

affiliated with King Pac following the original investigation; (2) price quotes on similar products, accompanied by affidavits by company officials, that were submitted with the petition; and (3) "transaction-specific margins for other companies in the initial investigation [that] corroborate that the selected AFA rate continues to give an accurate reflection of commercial practices in the industry." *Id.* at 1300. The court noted that Commerce had found "high-volume transaction-specific margins for cooperative companies which are both higher than the 122.88 percent petition rate and are close to that range." *Id.*

In 2007, Commerce conducted a second administrative review covering the period August 1, 2005, through July 31, 2006. King Pac failed to respond to Commerce's requests for information pertinent to that administrative review. In the preliminary results for the second administrative review, Commerce stated that it would again assign the 122.88 percent AFA rate to King Pac because King Pac had failed to cooperate with Commerce's review, had significantly impeded the review, and had not acted to the best of its ability. Polyethylene Retail Carrier Bags From Thailand, 72 Fed. Reg. 37,718, 37,720 (July 11, 2007) (preliminary results of administrative review).[1] Commerce further determined that the AFA rate it had selected remained reliable and relevant. *Id.*

---

[1]    Before publishing those preliminary results, Commerce placed in the record the memorandum explaining Commerce's decision to assign the 122.88 percent AFA rate to Zippac in the initial investigation and the memorandum explaining Commerce's decision to assign that same AFA rate to King Pac in the first administrative review. *See* Adverse Facts Available and the Corroboration of the Rate (Jan. 16, 2004); Decision to Apply Adverse Facts Available and the Appropriate Rate for the Preliminary Results of Review (Aug. 31, 2006).

In August 2007, KYD entered its appearance as an interested party. KYD challenged Commerce's selection of King Pac as a mandatory respondent and Commerce's application of the 122.88 percent AFA rate to King Pac for the second administrative review. Commerce rejected KYD's arguments and sustained the AFA rate of 122.88 percent for King Pac. Polyethylene Retail Carrier Bags From Thailand, 72 Fed. Reg. 64,580, 64,581 (Nov. 16, 2007) (final results of administrative review). At the same time, Commerce determined antidumping duty margins ranging from 0.80 percent to 1.87 percent for other respondents. *Id.*

In the memorandum in which Commerce explained its decision, Commerce noted that it had provided King Pac "with an opportunity to provide current information showing that its margin is lower than the adverse facts-available rate applied in earlier segments of the proceeding," but that King Pac had elected not to cooperate at all in the review. Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Polyethylene Retail Carrier Bags From Thailand for the Period of Review August 1, 2005, through July 31, 2006, at 6-7 (Nov. 8, 2007). Commerce noted the general rule that if a respondent fails to respond to a request for pricing data, Commerce may presume that the highest prior margin reflects the current margins. Based on that rule, Commerce elected to presume that "King Pac has not altered its past practices and that its previous rate is reflective of its current pricing practices and, therefore, has relevance in this administrative review." *Id.* at 7. Because King Pac had not cooperated with the Department in the two administrative reviews, and because the record contained no justification for a rate lower than the current rate applied to King Pac, Commerce concluded that the adverse facts available rate had been corroborated to the extent practicable through the use of information that

was corroborated in the original investigation and determined to be relevant to King Pac. *Id.*

KYD appealed Commerce's decision to the Court of International Trade, challenging the 122.88 percent AFA rate assigned to King Pac. The Court of International Trade affirmed Commerce's determination. It held that Commerce's selection and imposition of the AFA rate against King Pac (and thus against KYD as the importer of King Pac's products) was supported by substantial evidence and was in accordance with law. In particular, the court held that Commerce had adequately corroborated the AFA rate by determining that it was both reliable and relevant. The court concluded that the petition rate of 122.88 percent had not been discredited. The court reached that conclusion for two reasons: first, because the petition rate had been affirmed in the prior administrative review, in which it was corroborated by independent sources; and second, because it was reasonable for Commerce to conclude, given King Pac's refusal to cooperate in the second administrative review, that King Pac had not altered its past pricing practices "and that its previous rate is reflective of its current pricing practices and, therefore, has relevance in this administrative review." The court also ruled that the AFA rate was not punitive, because the AFA rate reasonably reflected the rate that would have applied had the party in question cooperated, plus a reasonable additional amount to deter non-compliance. Finally, the court ruled that KYD, as the importer of record of King Pac's PRCBs, was not entitled to an assessment rate different from the dumping margin assigned to King Pac. KYD appeals that decision.

## II

KYD renews its challenges to the selected AFA antidumping duty rate. It contends that the AFA rate was

uncorroborated and punitive, and that it is improper for Commerce to impose a high AFA rate against an importer such as KYD that is not related to an uncooperative party such as King Pac.

A

While acknowledging that Commerce enjoys "particularly great" discretion in applying an AFA margin to an uncooperative respondent, *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009), KYD complains that Commerce violated the statutory requirement that it corroborate information in the petition before using that information to establish an AFA rate. The statute that governs the use of "facts otherwise available" in antidumping determinations provides that when Commerce relies on "secondary information" rather than on information obtained in the course of an investigation or review, Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). Secondary information includes "[i]nformation derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under [19 U.S.C. § 1675] concerning the subject merchandise." Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103-316, at 870 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4199. Before Commerce can rely on secondary information, it must establish that "the secondary information to be used has probative value." *Id.*

In this case, Commerce first derived the AFA rate by using import statistics, price quotations for various sizes of PRCBs commonly produced in Thailand, and affidavits from company officials of a Thai producer of similar

products. KYD argues that, because that information was included with the petition filed by the domestic producers, Commerce was required to find other sources to corroborate that data. We disagree. The relevant inquiry focuses on the nature of the information, not on whether the source of the information was referenced in or included with the petition. The SAA explains that independent sources "may include, for example, published price lists, official import statistics and customs data, and information obtained from interested parties during the particular investigation or review." SAA at 870, *as reprinted in* 1994 U.S.C.C.A.N. at 4199. The information Commerce used to calculate King Pac's rate, i.e., price quotes and third-party company affidavits, is of the same independent nature; it did not change in character simply because the documents were attached to an antidumping petition. For that reason, we agree with Commerce and the Court of International Trade that the AFA rate was supported by independent information when it was first calculated.

KYD further contends that Commerce should not have applied the AFA rate to King Pac because that rate was neither reliable nor relevant to King Pac. Specifically, KYD asserts that the AFA rate was much higher than the dumping margin applied to other companies during the second administrative review and was not sufficiently supported by the underlying data. This court has made clear, however, that Commerce need not select, as the AFA rate, a rate that represents the typical dumping margin for the industry in question. For example, in *PAM, S.p.A.*, 582 F.3d at 1340, this court affirmed an AFA rate even though only 0.5% of the respondent's total sales were above the selected rate. Similarly, in *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002), we upheld an AFA rate even though only a single sale by the respondent was at the selected margin.

KYD asserts that because there is no evidence of any sales during the period of review for the second administrative review at margins above or near the 122.88 percent mark, it was improper for Commerce to assign that rate to King Pac in the second administrative review. However, the fact that current dumping margins for other companies in the same industry are lower than the rate applied to King Pac does not invalidate Commerce's determination. In its initial dumping determination and in the first administrative review, Commerce used evidence that accompanied the petition as well as evidence Commerce obtained in the course of its investigation and review to calculate a range of dumping margins. Because King Pac failed to participate in the first administrative review, Commerce acted within its discretion in drawing an adverse inference against King Pac and assigning it the highest calculated rate. *See F. lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1029, 1033-34 (Fed. Cir. 2000) (an uncooperative party may be assigned the "highest verified margin" of the cooperating companies, even though it was "highly likely that the real dumping margin for [that company] would be well under" the AFA rate); *Shanghai Taoen Int'l Co. v. United States*, 360 F. Supp. 2d 1339, 1345-48 (Ct. Int'l Trade 2005) (upholding a 223.01 percent AFA dumping margin, the "highest rate determined in the current or any previous segment of the proceeding" because "the rate reflects recent commercial activity" by a different exporter of the same goods from the same country, and because there was no prior dumping margin for that company on which Commerce could rely).

In this case, Commerce's choice of 122.88 percent as the AFA rate is well grounded because, as the Court of International Trade found following the first administrative review, that margin was supported not only by the evidence submitted with the petition, but also by Com-

merce's calculation of "high-volume transaction-specific margins for cooperative companies which are both higher than the 122.88 percent petition rate and are close to that rate." *Universal Polybag Co.*, 577 F. Supp. 2d at 1300-01. Therefore, Commerce had a sufficient basis for concluding that the AFA rate assigned to King Pac in the first administrative review was reliable.

During the second administrative review, Commerce was unable to calculate a dumping margin for King Pac directly because King Pac chose not to cooperate with Commerce's review. Commerce therefore decided to continue the 122.88 percent AFA rate that was assigned to King Pac in the prior administrative review. Significantly, we have held that Commerce is permitted to use a "common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (emphasis in original); *Ta Chen*, 298 F.3d at 1339 ("In cases in which the respondent fails to provide Commerce with the most recent pricing data, it is within Commerce's discretion to presume that the highest prior margin reflects the current margins."). Although KYD seeks to challenge the relevance of Commerce's calculation of the AFA rate established in the antidumping duty order and applied against King Pac in the first administrative review, KYD overlooks the fact that Commerce relied on the presumption that the rate established for King Pac in the first administrative review was still valid. KYD offered no evidence regarding King Pac's activities during the period of review for the second administrative review that would rebut that presumption. For that reason, Commerce correctly determined that the AFA rate remained relevant to King Pac.

The presumption that a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to cooperate in a subsequent administrative review distinguishes this case from this court's recent decision in *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010). In that case, in which the AFA margin far exceeded the calculated margin for cooperating respondents, we overturned an AFA margin as unsupported by substantial evidence. In *Gallant Ocean*, however, Commerce had not previously determined an antidumping duty against the exporter in question, and thus there was no occasion for the court to consider the presumption that an exporter's prior margin continues to be valid if the exporter fails to cooperate in a subsequent proceeding. That presumption applies in this case, and it was not rebutted.

Moreover, in *Gallant Ocean* this court concluded that the AFA margin that Commerce selected "did not and does not represent commercial reality" and ruled that Commerce "may not use the petition rate to establish the dumping margin when its own investigation revealed that the petition rate was not credible." *Gallant Ocean*, 602 F.3d at 1323. In this case, King Pac's failure to cooperate deprived Commerce of the most direct evidence of King Pac's actual dumping margin. In the first administrative review, however, Commerce was able to fill that evidentiary gap by looking to "high-volume transaction-specific margins for cooperative companies" that were higher than and close to the 122.88 percent rate, from which Commerce concluded that the AFA margin "does not lie outside the realm of actual selling practices." In light of King Pac's failure to cooperate in the second administrative review or provide any contrary evidence as to its export transactions for that period of review, we hold that sub-

stantial evidence supports the antidumping margin assessed against King Pac (and thus against KYD).

B

KYD next asserts that the AFA rate is so high that it is punitive in nature and for that reason must be vacated in light of the Supreme Court's decision in *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605 (2008), which imposed limits on the imposition of punitive damages in federal cases as a matter of federal common law. However, we rejected the same argument in *PAM S.p.A.*, 582 F.3d at 1341, where we held that "[n]othing in *Exxon Shipping*, a case with a very different fact pattern and legal issues, requires us to impose new limits on the discretion Congress granted to the Department of Commerce." We likewise reject the *Exxon*-based argument here. The antidumping laws "are remedial not punitive," *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995), and an antidumping rate based on AFA is designed "to provide respondents with an incentive to cooperate, not to impose punitive . . . margins," *DeCecco*, 216 F.3d at 1032. For that reason, an AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure, and the limitations applicable to punitive damages assessments therefore have no pertinence to duties imposed based on lawfully derived margins such as the margin at issue in this case.

C

Finally, KYD argues that Commerce should have assigned it an assessment rate different from the antidumping duty rate assigned to King Pac. KYD asserts that Commerce should apply AFA rates only against uncooperative parties and that a cooperative, independent im-

porter should not be required to pay an assessment based on an AFA dumping margin imposed on an uncooperative producer/exporter.

We find that argument unpersuasive. Under the antidumping duty statutes, Commerce is directed to set the assessment rate based on the calculated dumping margin. *See* 19 U.S.C. §§ 1673e(c)(3), 1675(a)(2)(C); 19 C.F.R. § 351.212(b). By statute and regulation, the importer is legally responsible for paying the assessed duties associated with the goods it imports. *See* 19 U.S.C. § 1673g(b)(4); 19 C.F.R. § 141.1(b)(1) ("liability for duties, both regular and additional, constitutes a personal debt due from the importer to the United States"). KYD does not point to any statute or regulation that would entitle independent importers to a different assessment rate from the rate for importers that are affiliated with the foreign producer/exporters of the goods they import.

Moreover, KYD's argument would allow an uncooperative foreign exporter to avoid the adverse inferences permitted by statute simply by selecting an unrelated importer, resulting in easy evasion of the means Congress intended for Commerce to use to induce cooperation with its antidumping investigations. The prospect that domestic importers will have to pay enhanced antidumping margins because of the uncooperativeness of the exporters from whom they purchase goods may, in some cases, result in the imposition of costs on an individual importer that the importer is unable to avoid. In the aggregate, however, the importers' exposure to enhanced antidumping duties seems likely to have the effect of either directly inducing cooperation from the exporters with whom the importers deal or doing so indirectly, by leaving uncooperative exporters without importing partners who are willing to deal in their products.

Because we find none of KYD's arguments for reducing the antidumping margin to be persuasive, we uphold the decision of the Court of International Trade.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

———————————

**KYD, INC.,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**POLYETHYLENE RETAIL CARRIER BAG
COMMITTEE,
HILEX POLY CO., LLC, AND SUPERBAG
CORPORATION,**
*Defendants-Appellees.*

———————————

2009-1366

———————————

Appeal from the United States Court of International Trade in case no. 07-00456, Judge Evan J. Wallach.

DYK, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I concur in large part with the majority opinion. My one area of disagreement relates to the holding that Commerce properly presumed that the rate established for King Pac Industrial Co., Ltd. ("King Pac") in the first administrative review was still valid for the period of the second administrative review such that it could be applied

against KYD, Inc. ("KYD"), an unrelated importer. *See* Majority Op. 12-13.

Here, King Pac (formerly Zippac), the exporter, participated but did not cooperate during the first administrative review and was assigned an extraordinarily high dumping margin of 122.88% based on adverse facts available. *See* 19 U.S.C. § 1677e(b). King Pac did not participate in the second administrative review, again refusing to cooperate. Commerce nonetheless presumed that the 122.88% dumping margin assigned to King Pac was still valid for the period of the second administrative review and used this dumping margin to calculate an assessment rate for importer KYD. The question is whether the presumption can be applied without corroborating data for the period of the second administrative review.

While the statute and regulations allow the use of adverse facts available against a non-cooperating party, *see id.*; 19 C.F.R. § 351.308, the presumption on which the majority relies does not appear in the statute or regulations, but is a product of agency decision making. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002) ("In cases in which the respondent fails to provide Commerce with the most recent pricing data, it is within Commerce's discretion to presume that the highest prior margin reflects the current margins."). We have sustained the use of this presumption as being within the agency's discretion on the theory that "it reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (emphasis in original). But those are cases in which the exporter was a party to the proceeding. That is not the case here. They are also not cases in which an importer

challenged the use of the presumption to establish a dumping margin.

KYD has a clear right to challenge the antidumping margin for the exporter, King Pac. *See* 19 U.S.C. § 1677(9) (defining United States importers of subject merchandise as "interested part[ies]"); *see also id.* § 1516a (providing that "an interested party who is a party to the proceeding in connection with which the matter arises may commence an action in the United States Court of International Trade . . . contesting any factual findings or legal conclusions upon which the determination is based"). Under the circumstances of this case, I think that applying the presumption against KYD is arbitrary and capricious.

First, KYD did not participate in the first administrative review, in which the 122.88% dumping margin for King Pac was established, and there has been no showing that KYD was then an "interested party" and could have participated in that review. KYD also did not refuse to cooperate with the investigation in the second administrative review; it was King Pac that failed to cooperate.

Second, there has been no showing that KYD did have, or could have had, access to records that would have enabled Commerce to compute a more accurate dumping margin for King Pac. As noted above, KYD is not related to King Pac. The majority faults KYD for its failure to produce such information, stating that "KYD offered no evidence regarding King Pac's activities during the period of review for the second administrative review that would rebut [the] presumption [that the rate established for King Pac was still valid]." Majority Op. 12-13. But this seems unfair if KYD did not have access to this information. The entire theory of the presumption is that the party injured had access to more recent data, and would have produced that data if it would have resulted in a more favorable dumping margin.

Third, the dumping margin assigned to King Pac is more than sixty-five times higher than the next highest dumping margin imposed in the second administrative review. This court has expressed concerns in the past over disproportionately high dumping margins calculated on the basis of adverse facts available. *See F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (noting that the purpose of adverse facts available is "to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins"); *see also Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) (holding that an adverse facts available rate that was more than ten times higher than the average dumping margin for cooperative respondents was punitive, aberrational, or uncorroborated, and excessive in view of the cooperative respondents' dumping rates).

The high dumping margin here is not corroborated by any current data. There is no reason to believe that this margin continues to be accurate for the period of the second administrative review. There was no determination by Commerce that the market conditions prevailing during the second administrative review were the same as those prevailing during the period of the first administrative review. And it is noteworthy in this connection that the dumping margins for other exporters declined substantially from 1.41-16.43% to 0.80-1.87% from the first to the second administrative review. *See* Polyethylene Retail Carrier Bags from Thailand, 72 Fed. Reg. 1982, 1983 (Dep't of Commerce Jan. 17, 2007) (final results of first administrative review); Polyethylene Retail Carrier Bags from Thailand, 72 Fed. Reg. 64,580, 64,581 (Dep't of Commerce Nov. 16, 2007) (final results of second administrative review). The government has argued that the dumping margins decreased as the result of the incentives

of the first administrative review antidumping order, and it has also admitted that this same "incentive" to reduce the dumping margin applied to King Pac.

In this situation, Commerce should be barred from using the presumption for the period of the second administrative review without corroborating data for the period in question. In the second administrative review, Commerce was of course permitted to use adverse facts available because King Pac refused to cooperate. *See* 19 U.S.C. § 1677e(b). But, our cases make clear that the dumping margin must be corroborated by "secondary information that has some grounding in commercial reality." *See Gallant Ocean*, 602 F.3d at 1324.[1] In the light of this governing principle, I think that Commerce, in making a determination, must corroborate using current facts, that is, not simply data from the first administrative review. Commerce's failure to do so in the second administrative review, in my view, renders its determination arbitrary and capricious, at least, where, as here, the complaining party had no access to the necessary data.

---

[1] *See Gallant Ocean*, 602 F.3d at 1323 (overturning an adverse facts available margin based on an adjusted petition rate where "Commerce incorrectly presumed that the adjusted petition rate was reliable in the face of much more reliable information"); *see also F.lli De Cecco*, 216 F.3d at 1032 ("[Congress] intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin.").